1
2
3
4

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

PUERTO RICO COFFEE ROASTERS LLC,

    Plaintiff,

    v.

PAN AMERICAN GRAIN MANUFACTURING CO., INC.,

    Defendant.

Civil No. 3:15-CV-02099 (JAF)

5
6

**OPINION AND ORDER**

7

**I.**

8

**Introduction**

9    On August 12, 2015, plaintiff Puerto Rico Coffee Roasters LLC ("P.R. Coffee

10    Roasters") commenced this action by filing a complaint against defendant Pan American

11    Grain Manufacturing Co., Inc. ("Pan American"), alleging a series of trademark, false

12    advertising, and related claims under federal and Puerto Rico law stemming from Pan

13    American's conduct in the coffee industry.  (ECF No. 1.)  On September 2, 2015, P.R.

14    Coffee Roasters served the complaint on Pan American.  (ECF No. 8 at 2.)  On

15    September 22, 2015, P.R. Coffee Roasters amended the complaint as a matter of course

16    under Rule 15(a)(1)(A) of the Federal Rules of Civil Procedure.  (ECF No. 31.)  The

17    amended complaint alleges eight causes of action against Pan American under the

18    Lanham Act, 15 U.S.C. §§ 1051 *et seq*., the Declaratory Judgment Act, 28 U.S.C.

19    §§ 2201 *et seq*., the Government of Puerto Rico Trademark Act, 10 L.P.R.A. §§ 223 *et*

20    *seq*., the Puerto Rico Libel and Slander Act, 32 L.P.R.A. §§ 3141 *et seq*., and Article

21    1802 of the Puerto Rico Civil Code, 31 L.P.R.A. § 5141.  (ECF No. 31 at 10-18.)

1    On September 28, 2015, Pan American moved the court to dismiss the amended

2    complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state

3    a claim upon which relief can be granted.  (ECF Nos. 38; 39.)  On October 8, 2015, P.R.

4    Coffee Roasters responded in opposition to the motion to dismiss.  (ECF No. 60.)  On

5    October 20, 2015, Pan American replied to P.R. Coffee Roasters's opposition.  (ECF

6    No. 79.)  The court now grants the motion in part and also denies it in part.

7                                          **II.**

8                        **Jurisdiction and Pleadings Standard**

9    As a general matter, "a court should first confirm the existence of rudiments such

10   as jurisdiction . . . before tackling the merits of a controverted case."  *Katz* v. *Pershing,*

11   *LLC*, 672 F.3d 64, 78 (1st Cir. 2012) (quoting *Berner* v. *Delahanty*, 129 F.3d 20, 23 [1st

12   Cir. 1997]).  It is uncontested that P.R. Coffee Roasters and Pan American are citizens of

13   the Commonwealth of Puerto Rico.  (ECF No. 31 ¶¶ 4-5.)  The court has original

14   jurisdiction of the Lanham Act and Declaratory Judgment Act claims under 28 U.S.C.

15   §§ 1331 and 1338.  The court also has original and supplemental jurisdiction of the

16   remaining claims, which allege unfair competition under several Puerto Rico statutes,

17   pursuant to 28 U.S.C. §§ 1338 and 1367(a).  *See generally Purolator, Inc.* v. *Efra*

18   *Distribs.*, 687 F.3d 554, 558-59 (1st Cir. 1982) (reviewing the jurisdictional scope of 28

19   U.S.C. § 1338).  Thus, the court finds that it has jurisdiction over the entire action.

20   "Under the Federal Rules of Civil Procedure, a complaint must provide 'a short

21   and plain statement of the claim showing that the pleader is entitled to relief.'"  *Cardigan*

22   *Mt. Sch.* v. *N.H. Ins. Co.*, 787 F.3d 82, 84 (1st Cir. 2015) (quoting Fed. R. Civ.

1   P. 8[a][2]).  "To meet that standard, a plaintiff 'need not demonstrate that [it] is likely to

2   prevail' on its claim."  *Id.* (alteration in original) (quoting *García-Catalán* v. *United*

3   *States*, 734 F.3d 100, 102 (1st Cir. 2013)).  "Rather, the complaint need include only

4   enough factual detail to make the asserted claim 'plausible on its face.'"  *Id.* (quoting

5   *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009)).  "To evaluate the sufficiency of a complaint

6   under Rule 8, we first must 'distinguish the complaint's factual allegations (which must

7   be accepted as true) from its conclusory legal allegations (which need not be credited).'"

8   *Id.* (internal quotations omitted) (quoting *García-Catalán*, 734 F.3d at 103).  "[W]e must

9   'accept the truth of all well-pleaded facts and draw all reasonable inferences therefrom in

10  the pleader's favor.'"  *Id.* at 87 (quoting *García-Catalán*, 734 F.3d at 102).  "We then

11  must 'determine whether the factual allegations are sufficient to support the reasonable

12  inference that the defendant is liable . . . .'"  *Id.* (internal quotations omitted) (quoting

13  *García-Catalán*, 734 F.3d at 103).

14                                          **III.**

15                                  **<u>Legal Analysis</u>**

16          This case presents an interesting controversy.  P.R. Coffee Roasters and Pan

17  American are competitors in the market for Puerto Rican coffee.  P.R. Coffee Roasters

18  alleges that Pan American is infringing P.R. Coffee Roasters' trademarks in the

19  longstanding "Café Rico" brand of coffee by marketing and selling, in the State of

20  Florida, a new brand of coffee called "Rico Coffee."[1]  (ECF No. 31 ¶¶ 18-21, 42-45, 51.)

---

[1] At this early stage of the litigation, the geographic scope of Pan American's marketing and sales of Rico Coffee is not yet clear.  P.R. Coffee Roasters alleges that it sells Café Rico in Puerto Rico, Florida, New York, and New Jersey, as well as over the internet.  (ECF No. 31 ¶ 16.)

Civil No. 3:15-CV-02099 (JAF)                                               -4-

1    P.R. Coffee Roasters also alleges that the statement, on packages of Rico Coffee, that "it

2    is no accident Puertorrican coffee is the prefered [sic] coffee of Popes and Kings"

3    infringes P.R. Coffee Roasters' alleged trademark in the slogan "The Coffee of Popes &

4    Kings," which appears on packages of "Alto Grande" coffee, another P.R. Coffee

5    Roasters brand.  (ECF Nos. 31 ¶¶ 22, 52-53; 31-12; 31-17.)  P.R. Coffee Roasters claims

6    that Pan American is engaging in this alleged infringement in an attempt to confuse

7    consumers into believing that a package of Rico Coffee comes from the same "source"

8    as, and thus has the same "quality" as, a package of Café Rico or Alto Grande, thereby

9    trading on the "fame" and "goodwill" of P.R. Coffee Roasters' coffee brands.  (ECF

10   No. 31 ¶¶ 6, 22, 55.)  At the same time, P.R. Coffee Roasters alleges that Pan American

11   is also seeking to "damage" and "tarnish[]" that fame and goodwill by waging a

12   "defamation campaign" that accuses P.R. Coffee Roasters of "using child labor," "selling

13   imported coffee as local coffee," and "participating in efforts to undermine the Puerto

14   Rico coffee industry," among other bad acts.  (ECF No. 31 ¶¶ 54-55, 59, 75.)  In sum,

15   P.R. Coffee Roasters accuses Pan American of conduct that is not only wrongful, but also

16   at cross-purposes with itself – namely, seeking to benefit from, but ultimately destroy, the

17   reputation of P.R. Coffee Roasters' coffee brands.  Some, but not all, of P.R. Coffee

18   Roasters' claims are well-pleaded and thus survive Pan American's motion to dismiss.

19   **A.     <u>Federal Trademark Claims</u>**

20          Under the Lanham Act, "[a] plaintiff alleging trademark infringement must prove

21   two elements: (1) the trademarks are 'entitled to trademark protection,' and (2) 'the

22   allegedly infringing use is likely to cause consumer confusion.'"  *Bose Corp.* v. *Ejaz*, 732

1   F.3d 17, 26 (1st Cir. 2013) (quoting *Bos. Duck Tours, LP* v. *Super Duck Tours, LLC*, 531

2   F.3d 1, 12 (1st Cir. 2008) (trademark action under 15 U.S.C. § 1114)); *see also Oriental*

3   *Fin. Group, Inc.* v. *Cooperativa De Ahorro Crédito Oriental*, 698 F.3d 9, 16 (1st Cir.

4   2012) (same) (action under § 1125).  "A mark is entitled to trademark protection if it is

5   capable of functioning as a source-identifier of goods."  *Bos. Duck Tours*, 531 F.3d at 12

6   (citing *Two Pesos, Inc.* v. *Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992)).  Under 15

7   U.S.C. § 1114(1), but not 15 U.S.C. § 1125(a)(1), trademark protection is afforded only

8   to "a registered mark."  15 U.S.C. §§ 1114(1) (limiting cause of action to "a registered

9   mark"), 1125(a)(1) (containing no such limitation).

10          In Count I, P.R. Coffee Roasters sufficiently pleads a trademark-infringement

11   claim under 15 U.S.C. § 1114(1).[2]  First, P.R. Coffee Roasters alleges that "[t]he Café

12   Rico mark has been registered in the United States Patent and Trademark Office

13   ("Patent & Trademark Office") since October 19, 2010 (Cert. Reg. No. 3862361)," and

14   that the "registration is valid, subsisting, and unrevoked."  (ECF No. 31 ¶ 7.)  Next, P.R.

15   Coffee Roasters alleges that "P.R. Coffee Roasters' ownership o[f] the Café Rico

---

[2] 15 U.S.C. § 1114(1) provides in pertinent part:
          Any person who shall, without the consent of the registrant—
          (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of
a registered mark in connection with the sale, offering for sale, distribution, or advertising
of any goods or services on or in connection with which such use is likely to cause
confusion, or to cause mistake, or to deceive; or
          (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply
such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints,
packages, wrappers, receptacles or advertisements intended to be used in commerce upon
or in connection with the sale, offering for sale, distribution, or advertising of goods or
services on or in connection with which such use is likely to cause confusion, or to cause
mistake, or to deceive,
          shall be liable in a civil action by the registrant for the remedies hereinafter
provided.  Under subsection (b) hereof, the registrant shall not be entitled to recover
profits or damages unless the acts have been committed with knowledge that such
imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

1   trademark is notorious and known to Pan American" due to a series of deals and litigation

2   by Pan American involving the mark.  (ECF No. 31 ¶¶ 17, 23-27.)  P.R. Coffee Roasters

3   further alleges that, despite this knowledge, "Pan American is selling packaged coffee

4   using the brand Rico Coffee in Florida, using the same name, packaging format, and

5   color scheme as P.R. Coffee Roasters' Café Rico."  (ECF No. 31 ¶ 19.)  P.R. Coffee

6   Roasters also alleges that "Pan American's Rico Coffee is marketed to the same type of

7   consumers" as P.R. Coffee Roasters' brands, such as "the Puerto Rican community in

8   Florida, who know and have been consuming Café Rico for more than 70 years," and is

9   sold "through the same type of channels . . . in which P.R. Coffee Roasters sells its Café

10  Rico and other coffee products."  (ECF No. 31 ¶¶ 20-21, 44.)  Based on these factual

11  allegations, P.R. Coffee Roasters posits "a likelihood of confusion between Pan

12  American's Rico Coffee and P.R. Coffee Roasters' Café Rico" – a likelihood that P.R.

13  Coffee Roasters deems "intentional" on the part of Pan American.  (ECF No. 31 ¶¶ 45-

14  46.)  These allegations adequately plead the claim.

15        Pan American's arguments to the contrary are unavailing.  Pan American faults

16  P.R. Coffee Roasters' amended complaint for "not present[ing] a single shred of

17  admissible evidence to establish (i) the essential elements of its claims for relief, and

18  (ii) to rebut the fact that Pan American has prior, exclusive and incontestable trademark

19  rights over the Rico trademark and trade dress that are far superior to any rights P.R.

20  Coffee Roasters may have over the Café Rico name, trade dress or color scheme."[3]  (ECF

_____

[3] The court has reformatted the quoted text by reproducing it in regular font without any emphasis.  Pan American's submissions to the court frequently engage in the annoying and amateurish practice of boldfacing and underscoring large swathes of text, as if to indicate that these words are truly

1    No. 39 at 5.)  But P.R. Coffee Roasters does not have to present any admissible evidence

2    at the pleadings stage.  "Rather, the complaint need include only enough factual detail to

3    make the asserted claim 'plausible on its face.'"  *Cardigan Mt. Sch.*, 787 F.3d at 84

4    (quoting *Iqbal*, 556 U.S. at 678).  Admissible proof is required only at the summary-

5    judgment stage, where the "very mission" of the procedure "is to pierce the pleadings and

6    to assess the proof in order to see whether there is a genuine need for trial."  *Henry* v.

7    *United Bank*, 686 F.3d 50, 54 (1st Cir. 2012) (quoting *Hodgens* v. *General Dynamics*

8    *Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)); *see also* Fed. R. Civ. P. 56(c)(2).  By contrast,

9    the pleadings stage, true to its name, rightfully focuses on the pleadings, especially since

10   "little or no evidence has yet been produced."  *Amoche* v. *Guar. Trust Life Ins. Co.*, 556

11   F.3d 41, 50 (1st Cir. 2009).

12        Similarly, since the pleadings are factually sufficient, the mere "possibility" that

13   Pan American may have a factual defense to its alleged infringement based on its senior

14   use of the trademark "is inadequate to allow [Pan American] to prevail on a motion to

15   dismiss."[4]  *See Rodríguez-Vives* v. *P.R. Firefighters Corps of P.R.*, 743 F.3d 278, 283

---

important, whereas non-emphasized words can safely be skipped over without much loss in content. Often, the exact opposite proves true.  All of the text quoted from the briefing has been reproduced in regular format.

[4] At times, Pan American seems to argue that because it holds an incontestable right to use the trade dress for "Arroz Rico," a brand of packaged rice, it has the right to use a similar trade dress for "Rico Coffee."  (*See* ECF No. 39 at 6-7.)  That argument ignores P.R. Coffee Roasters' allegation that the use of a consistent trademark for Café Rico, whether registered or not, dates back to "approximately 1936" and that P.R. Coffee Roasters is, thus, the senior user of the mark in the coffee industry.  (ECF No. 31 ¶ 6.)  *See Dorpan, S.L.* v. *Hotel Meliá, Inc.*, 728 F.3d 55, 62-63 (1st Cir. 2013) ("The territorial rights of a holder of a federally registered trademark are always subject to any superior common law rights acquired by another party through actual use prior to the registrant's constructive use.") (quoting *Allard Enters.* v. *Advanced Programming Res., Inc.*, 249 F.3d 564, 572 (6th Cir. 2001)).  In any event, despite Pan American's frequent use of broad language to suggest otherwise, Pan American

1  (1st Cir. 2014).  The same holds true for all the other defenses requiring fact-finding that

2  Pan American alleges in the motion to dismiss.  (*See* ECF No. 39 at 6-17.)

3          In Count II, P.R. Coffee Roasters sufficiently pleads a trademark-infringement

4  claim under 15 U.S.C. § 1125(a)(1)(A).[5]  Focusing on the allegedly "misleading name

5  and packag[ing]" of Rico Coffee, P.R. Coffee Roasters asserts that Pan American is

6  "using a name and image confusingly similar to P.R. Coffee Roasters' Café Rico" to

7  "creat[e] the false . . . impression that its coffee originates with or is affiliated, connected,

8  or associated with P.R. Coffee Roasters."  (ECF No. 31 ¶ 51.)  P.R. Coffee Roasters

9  alleges that "the Café Rico mark" has "been in continuous use by P.R. Coffee Roasters

10 and its predecessors in interest since approximately 1936," thereby "acquir[ing] a high

11 degree of fame, distinctiveness, international exposure, and goodwill."  (ECF No. 31 ¶ 6.)

12 P.R. Coffee Roasters further alleges that Pan American's use of the phrase "the prefered

13 [sic] coffee of Popes and Kings" on packages of Rico Coffee contributes to "the false and

14 misleading impression" because "The Coffee of Popes & Kings" has been "the slogan of

15 P.R. Coffee Roasters' Alto Grande coffee for, at least, the last 25 years" and thus "is

acknowledges that its allegedly incontestable right to use the "Arroz Rico" trade dress is limited to the "rice" industry.  (*See* ECF No. 39 at 6 n.1.)

[5] 15 U.S.C. § 1125(a)(1) provides in pertinent part:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

1    widely recognized and identified with Alto Grande by consumers, locally and

2    internationally." (ECF Nos. 31 ¶¶ 22, 52; 31-12; 31-17.) These allegations, along with

3    those reviewed under Count I, adequately plead the claim.

4          Once again, Pan American's arguments to the contrary are unavailing for many of

5    the same reasons as before. Pan American is correct that, insofar as P.R. Coffee Roasters

6    claims that "Café Rico" is an unregistered but protected word mark under federal law,[6]

7    P.R. Coffee Roasters must allege and later prove secondary meaning because "Café

8    Rico" appears to be a descriptive Spanish phrase that means "delicious, rich coffee."

9    (ECF No. 39 at 16, citing ECF No. 31-8, and 19.) *See Borinquen Biscuit Corp.* v. *M.V.*

10   *Trading Corp.*, 443 F.3d 112, 116-18 (1st Cir. 2006) (on the need to prove secondary

11   meaning when claiming a descriptive phrase as a mark). But P.R. Coffee Roasters has

12   adequately pleaded secondary meaning circumstantially by alleging that the word mark

13   has been in continuous use since the 1930s, such that "the Puerto Rican community in

14   Florida . . . know[s] and ha[s] been consuming Café Rico for more than 70 years," and by

15   appending to the amended complaint historic examples of the advertising and promotion

16   of the mark, which demonstrate the efforts that have been made over the decades to

17   promote a conscious connection, in the public's mind, between the word mark "Café

18   Rico" and the product "Café Rico." (ECF Nos. 31 ¶¶ 6, 20; 31-4; 31-5.) *See Flynn* v. *AK*

19   *Peters, Ltd.*, 377 F.3d 13, 20 (1st Cir. 2004) (listing types of circumstantial evidence

20   plaintiffs may use to establish secondary meaning).

---

[6] According to the federal trademark registration that P.R. Coffee Roasters appended to the amended complaint, no claim is made, under the registered Café Rico mark, to "the exclusive right to use 'Café Rico', apart from the mark as shown." (ECF No. 31-8.)

1    At the pleading stage, "a complaint does not need 'detailed factual allegations' to

2    survive a motion to dismiss," but only "enough" factual allegations "to raise a right to

3    relief above the speculative level." *Gorelik* v. *Costin*, 605 F.3d 118, 121 (1st Cir. 2010)

4    (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 [2007]).  P.R. Coffee Roasters

5    has cleared the low hurdle of alleging that, in Florida, the Café Rico mark "is capable of

6    functioning as a source-identifier of" P.R. Coffee Roasters' coffee.  *See Bos. Duck Tours*,

7    531 F.3d at 12.  By contrast, at the summary-judgment stage and later, "[p]roof of

8    secondary meaning entails vigorous evidentiary requirements."  *Flynn*, 377 F.3d at 20

9    (quoting *Boston Beer Co., Ltd. P'ship* v. *Slesar Bros. Brewing Co.*, 9 F.3d 175, 181 (1st

10   Cir. 1993)); *see also Yankee Candle Co.* v. *Bridgewater Candle Co.*, 259 F.3d 25, 43-45

11   (1st Cir. 2001) (explaining the importance of "consumer surveys and testimony by

12   individual consumers" to proving secondary meaning).  P.R. Coffee Roasters must be

13   prepared to meet them, if it hopes to prevail.

14   Pan American also complains that, insofar as P.R. Coffee Roasters is basing its

15   Section 1125(a)(1)(A) claim on more than its registered design mark and unregistered

16   word mark, P.R. Coffee Roasters "has failed to: (i) identify the specific elements of the

17   trade dress that allegedly comprise the allegedly infringed trade dress; (ii) allege that it

18   owns an inherently distinctive trade dress; and (ii[i]) allege that the trade dress is non

19   functional."  (ECF No. 39 at 20.)  But P.R. Coffee Roasters has not claimed trade-dress

20   infringement.  In the amended complaint, P.R. Coffee Roasters expressly uses the term

21   "trade dress" only twice: Once, when mentioning how "P.R. Coffee Roasters'

22   predecessors in interest previously used the slogan 'The Coffee or [sic] Royalty' in Café

1   Rico's packaging," and again, when mentioning how "the phrase 'the Coffee of Popes

2   and Kings' . . . has been the slogan of P.R. Coffee Roasters' Alto Grande coffee for, at

3   least, the last 25 years."  (ECF No. 31 ¶¶ 22, 52.)  Thus, P.R. Coffee Roasters mentions

4   "trade dress" only as part of its trademark claim about Pan American's alleged

5   infringement of the slogan of Alto Grande coffee.  P.R. Coffee Roasters confirms this

6   reading of the pleadings when it states, in its opposition, that it "has made no separate

7   claim for trade dress infringement."[7]  (ECF No. 60 at 18.)

8        Pan American is correct to point out that P.R. Coffee Roasters has "failed to

9   properly allege and identify the trade dress(es) that it purportedly owns."  (ECF No. 79 at

10  5.)  But the court accepts P.R. Coffee Roasters' representation that it is not pursuing a

11  trade-dress claim in the amended complaint despite occasional language to the contrary.

12  Going forward, the doctrine of judicial estoppel will bind P.R. Coffee Roasters to that

13  representation.  *See generally United States* v. *Szpyt*, 785 F.3d 31, 41-42 (1st Cir. 2015).

14       The court nonetheless understands Pan American's general concern about

15  identifying the specific elements of the Café Rico mark.  After all, the amended

16  complaint indicates that variations of the mark have been used over time.  (*See* ECF

17  Nos. 31-1, 31-2, 31-3, 31-4.)  But the amended complaint is clear that the presently

18  "valid" and "subsisting" mark is synonymous with registered United States Trademark

19  Number 3,862,361 and registered Puerto Rico Trademark Number 32,028.  (ECF No. 31

20  ¶¶ 7-8.)  And, the United States registration sets forth a detailed description of what "the

---

[7] Pan American reads into paragraph fifty-four of the amended complaint a "trademark dilution" claim under 15 U.S.C. § 1125(c).  (See ECF No. 39 at 22-24.)  But the paragraph does not plead such a claim, and P.R. Coffee Roasters does not allege that it pleads such a claim.  (*See* ECF No. 60.)

Civil No. 3:15-CV-02099 (JAF)                                                    -12-

1    mark consists of," while the Puerto Rico registration describes the mark as consisting of

2    the words "Café Rico."  (ECF Nos. 31-8, 31-9.)  Thus, according to the pleadings, the

3    mark in its totality consists of two independently protectable and protected elements: The

4    federal design mark, and also the word mark.  The degree to which those elements are

5    actually protected, whether together or separately, will depend, of course, on the scope of

6    their registration and, lacking that, of their secondary meaning, if any, within specific

7    geographic areas.[8]

8    **B.**    **Federal False-Advertising Claims**

9            In Count III, P.R. Coffee Roasters sufficiently pleads a false-advertising claim

10   under 15 U.S.C. § 1125(a)(1)(B).  "To prove a false advertising claim under the Lanham

11   Act, a plaintiff must demonstrate that (1) the defendant made a false or misleading

12   description of fact or representation of fact in a commercial advertisement about his own

13   or another's product; (2) the misrepresentation is material, in that it is likely to influence

14   the purchasing decision; (3) the misrepresentation actually deceives or has the tendency

15   to deceive a substantial segment of its audience; (4) the defendant placed the false or

16   misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to

17   be injured as a result of the misrepresentation, either by direct diversion of sales or by a

18   lessening of goodwill associated with its products."  *Cashmere & Camel Hair Mfrs. Inst.*

---

[8] The court finds this to be the most natural reading of the amended complaint because it accounts for the fact that P.R. Coffee Roasters alleges that the Café Rico mark, at the height of its protection, is covered by both the registered federal trademark and the registered Puerto Rico trademark.  If this reading fails to capture the specific elements of the mark, P.R. Coffee Roasters should move the court for leave to amend the complaint to specify, in exact detail, the content of the mark as currently used.

1   v. *Saks Fifth Ave.*, 284 F.3d 302, 310-11 (1st Cir. 2002) (citing *Clorox Co.* v. *Proctor &*

2   *Gamble Commer. Co.*, 228 F.3d 24, 33 n.6 (1st Cir. 2000)).

3       First, P.R. Coffee Roasters alleges that "Pan American has made false statements

4   in commercial advertising" about "the P.R. Coffee Roasters coffee brands, including

5   [Café] Rico."  (ECF No. 31 ¶ 58.)   "[T]o pass the pleading threshold," P.R. Coffee

6   Roasters "at the very least must identify some medium or means through which the

7   defendant disseminated information to a particular class of consumers." *Podiatrist Ass'n*

8   v. *La Cruz Azul de P.R., Inc.*, 332 F.3d 6, 19-20 (1st Cir. 2003).  P.R. Coffee Roasters

9   clears this hurdle by alleging that Pan American's false ads are "circulating in the press,

10  social media, and other publicity controlled and/or sponsored by Pan American," and,

11  more specifically, that Pan American's false "ads and sponsored social media sites [are]

12  disseminated under the Facebook accounts for Pan American's brand Café Mami and the

13  campaign 'Salvemos el café 100% puertorriqueño,' controlled by Pan American's public

14  relations team."  (ECF No. 31 ¶¶ 33, 60.)

15      Second, P.R. Coffee Roasters alleges that Pan American's false ads accuse P.R.

16  Coffee Roasters of "using child labor to produce its coffee, [of] receiving benefits from

17  the Government to buy cheaper coffee, [of] selling imported coffee as local coffee, [of]

18  alleged[ly] adulterati[ng] its coffee, [of] running a monopoly in the coffee industry and

19  destroying the local coffee growers, and [of] jointly participating [with the Government]

20  in efforts to undermine the Puerto Rico coffee industry."  (ECF No. 31 ¶ 59.)  These

21  alleged falsities are clearly material because they all "relate[] to an 'inherent quality or

22  characteristic' of [P.R. Coffee Roasters's coffees]." *See Cashmere & Camel Hair*, 284

Civil No. 3:15-CV-02099 (JAF)                                                    -14-

1   F.3d at 311-12 (quoting *Nat'l Basketball Ass'n* v. *Motorola, Inc.*, 105 F.3d 841, 855 (2d

2   Cir. 1997)).  Whether a P.R. Coffee Roasters coffee is cheap or good, imported or local,

3   adulterated or pure, destructive of Puerto Rico or supportive of it, and complicit in child

4   labor or standing against it are all material representations about the coffee because they

5   all "relate[] to a characteristic that defines the product at issue, as well as the market in

6   which it is sold." *Id.* at 112.  For example, Café Rico brands itself as "100% pure coffee"

7   and also "Puerto Rico's best and purest coffee."  (ECF Nos. 31-2; 31-20.)  Pan

8   American's alleged accusations strike at the very heart of that brand.

9           Third, P.R. Coffee Roasters need not allege that Pan American's false ads tend to

10  deceive a substantial segment of their audience.  In the amended complaint, P.R. Coffee

11  Roasters routinely calls Pan American's ads and promotions "false" and "defamatory,"

12  but never anything akin to "true yet misleading."  (*See* ECF No. 31 ¶¶ 33, 35, 58-60).

13  Accordingly, P.R. Coffee Roasters is alleging that Pan American's ads and promotions

14  are "literally false," not "implicitly false."  *See Cashmere & Camel Hair*, 284 F.3d at 311

15  (explaining the distinction).  "When a plaintiff [claims] that a defendant has made a

16  material misrepresentation that is literally false, there is no need to burden the plaintiff

17  with the onerous task of demonstrating how consumers perceive the advertising." *See id.*

18  at 314 (citing *Balance Dynamics Corp.* v. *Schmitt Indus.*, 204 F.3d 683, 693 (6th Cir.

19  2000)).  After all, "[c]ommon sense and practical experience tell us that we can presume,

20  without reservation, that consumers have been deceived when a defendant has explicitly

21  misrepresented a fact that relates to an inherent quality or characteristic of the article

22  sold." *Id.* at 315.

1    Fourth, P.R. Coffee Roasters' claim that Pan American's false "ads and sponsored

2    social media sites [are] disseminated under the Facebook accounts for Pan American's

3    brand Café Mami and the campaign 'Salvemos el café 100% puertorriqueño'" adequately

4    allege that Pan American placed its statements in interstate commerce.  (ECF No. 31

5    ¶ 60.)  Facebook is one of the "most trafficked website[s] in the United States" with

6    "over 60,000,000 users" as far back as 2008.  *ConnectU LLC* v. *Zuckerberg*, 522 F.3d 82,

7    85 n.1 (1st Cir. 2008).  And, anything that has "traveled via the Internet" has "traveled in

8    interstate commerce."  *United States* v. *Chiaradio*, 684 F.3d 265, 281 (1st Cir. 2012)

9    (citing *United States* v. *Lewis*, 554 F.3d 208, 215 (1st Cir. 2009)).

10    Fifth, P.R. Coffee Roasters alleges that Pan American's alleged "defamation

11    campaign" seeks to "actively harm P.R. Coffee Roasters' position, reputation, and ability

12    to compete on fair terms," thereby benefitting Pan American by "position[ing] its coffee

13    brands, including the illegitimate Rico coffee, at a better market share."  (ECF No. 31

14    ¶ 54.)  Although Pan American declines to admit that it has made any of the allegedly

15    defamatory statements, Pan American concedes that such statements have been made and

16    have dealt "a very hard blow to P.R. Coffee Roasters' commercial image among

17    consumers."  (ECF No. 39 at 25.)

18    Accordingly, P.R. Coffee Roasters has adequately pleaded a false-advertising

19    claim against Pan American regarding Pan American's alleged statements about P.R.

20    Coffee Roasters and its coffees.  For many of the same reasons, P.R. Coffee Roasters has

21    also sufficiently pleaded a second false-advertising claim against Pan American – one

22    regarding Pan American's allegedly false statements about its own coffees.  According to

1   the amended complaint, "[a]t the same time" that Pan American has been waging an

2   alleged defamation campaign against P.R. Coffee Roasters, Pan American has pursued "a

3   public campaign alleging that, contrary to P.R. Coffee Roasters, it is protecting locally

4   produced coffee and is promoting," under the "slogan 'Salvemos el Café 100%

5   puertorriqueño' (Save the 100% Puertorrican Coffee)," that "consumers [should] only

6   purchase coffee made with 100% Puertorrican coffee."  (ECF No. 31 ¶¶ 34, 37, 59.)  P.R.

7   Coffee Roasters alleges that this pro-Pan American campaign is "false" and "deceitful"

8   because "Pan American's brands," including at least "two of the three brands affiliated

9   [with] Pan American" – Del Patio and De Mi Tierra – "use imported coffee and the

10  demise of the Puerto Rico coffee industry has been caused in large part by Pan

11  American's abusive use of its control of the fertilizer market against the same coffee

12  growers it now claims to defend," such as by allegedly "using its 90% market control" of

13  the Puerto Rico fertilizer market to "double[] the price of fertilizers in 2005, thereby

14  affecting several industries, including the coffee industry."  (ECF No. 31 ¶¶ 34, 36-37.)

15      Pan American does not challenge the sufficiency of the false-advertising claim

16  that focuses on its alleged dissimulations about "the nature, characteristics, qualities, or

17  geographic origin of [its own] goods, services, [and] commercial activities."  *See* 15

18  U.S.C. § 1125(a)(1)(B).  Instead, Pan American zeroes in on the claim about its alleged

19  misrepresentations of P.R. Coffee Roasters and its coffee brands, asserting that the court

20  does not have "jurisdiction" to hear the claim because "all of the purported disparaging

21  acts and events giving rise to the claim occur[red] in Puerto Rico" and were "directed at

22  the local consuming public in Puerto Rico" and, thus, did "not affect interstate commerce

1   or P.R. Coffee Roasters' interstate reputation." (ECF No. 39 at 24-25.) Pan American is

2   correct to point out that the constitutional basis of – and thus the constitutional limit to –

3   Congress' regulation of trademarks is its power under the Commerce Clause. *See I.P.*

4   *Lund Trading ApS* v. *Kohler Co.*, 163 F.3d 27, 50 (1st Cir. 1998). But that power

5   bestows "expansive reach." *United States* v. *Roszkowski*, 700 F.3d 50, 58 (1st Cir. 2012).

6   And, the provisions of the Lanham Act extend "to the full reach of Congress under the

7   Commerce Clause, Article I, § 8, clause 3 of the Constitution." *Purolator*, 687 F.2d at

8   558 (citing 15 U.S.C. § 1127); *see also McBee* v. *Delica Co.*, 417 F.3d 107, 116-26 (1st

9   Cir. 2005) (expounding on the broad jurisdictional reach of the Lanham Act).

10          The court finds that P.R. Coffee Roasters' false-advertising claims are cognizable

11   under the Lanham Act. Those claims fall within "the heartland of Congress' authority

12   under the Commerce Clause [to] 'regulat[e] the channels and instrumentalities of

13   interstate commerce, as well as activities that substantially affect interstate commerce.'"

14   *Roszkowski*, 700 F.3d at 58 (quoting *United States* v. *Teleguez*, 492 F.3d 80, 87 [1st Cir.

15   2007]). As noted above, Pan American allegedly waged part of its defamation campaign

16   through online "ads and sponsored social media sites." (ECF No. 31 ¶ 60.) And,

17   anything that has "traveled via the Internet" has "traveled in interstate commerce."

18   *Chiaradio*, 684 F.3d at 281 (citing *Lewis*, 554 F.3d at 215). In other words, the internet is

19   an "instrumentality of interstate or foreign commerce." *United States* v. *Dwinells*, 508

20   F.3d 63, 65 (1st Cir. 2007). Even if the internet was not used to publish parts of Pan

21   American's alleged defamation campaign, "an adverse effect on the sales or goodwill of

22   one whose trademark is used in interstate commerce is a sufficiently substantial effect on

1   interstate commerce to entitle [P.R. Coffee Roasters] to invoke the protection of the

2   Lanham Act, even if the [acts] of [Pan American's] are wholly intrastate."   *See*

3   *Purolator*, 687 F.2d at 559.

4        Pan American also alleges that the First Amendment erects a categorical bar

5   against the false-advertising claims.  (ECF No. 39 at 25-27.)  Pan American is mistaken.

6   "Affirmative defenses," such as a First Amendment right to engage in challenged

7   conduct, "may be raised in a motion to dismiss under Federal Rule of Civil Procedure

8   12(b)(6), provided that 'the facts establishing the defense [are] clear on the face of the

9   plaintiff's pleadings.'"  *Santana-Castro* v. *Toledo-Davila*, 579 F.3d 109, 113-14 (1st Cir.

10  2009) (alteration in original) (internal quotations omitted) (quoting *Trans-Spec Truck*

11  *Serv., Inc.* v. *Caterpillar, Inc.*, 524 F.3d 315, 320 (1st Cir. 2008)).  Here, the amended

12  complaint does not clearly establish that Pan American had a First Amendment right to

13  engage in the allegedly false commercial speech underlying P.R. Coffee Roasters' claims.

14  "For commercial speech to come within [the First Amendment], it at least must . . . not be

15  misleading."  *Lorillard Tobacco Co.* v. *Reilly*, 533 U.S. 525 (2001) (quoting *Cent.*

16  *Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n*, 447 U.S. 557, 566 (1980)).

17  Moreover, "[u]ntruthful speech, commercial or otherwise, has never been protected for its

18  own sake."  *Rocket Learning, Inc.* v. *Rivera-Sánchez*, 715 F.3d 1, 14 (1st Cir. 2013)

19  (quoting *Va. State Bd. of Pharmacy* v. *Va. Citizens Consumer Council, Inc.*, 425 U.S.

20  748, 771 (1976)).  Accordingly, the Lanham Act false-advertising claims survive the

21  motion to dismiss.

1   **C.    Puerto Rico Trademark Claim**

2          The court finds that, in Court IV, P.R. Coffee Roasters fails to state a valid

3   trademark-infringement claim under Puerto Rico law.  P.R. Coffee Roasters alleges that

4   Pan American's marketing and sale of Rico Coffee in Florida violates P.R. Coffee

5   Roasters' trademark rights under 10 L.P.R.A. § 223w.  (ECF No. 31 ¶ 64.)  The statute

6   prohibits the unlicensed and misleading use of "any mark identical or similar to a mark"

7   that is either registered with the Puerto Rico Department of State or the property of a

8   senior user of the mark in Puerto Rico trade.  *See* 10 L.P.R.A. §§ 223(k), 223(r), 223w.

9   Statutory and constitutional considerations dictate against the application of a Puerto

10  Rico commercial regulation to conduct in Florida.[9]

11         First, nothing in Puerto Rico trademark law suggests that the Legislature intended

12  10 L.P.R.A. § 223w to apply extraterritorially.  Puerto Rico trademark law is effectively a

13  body of commercial rules that "regulates and protects the commercial symbols known as

14  trademarks."  *Colgate-Palmolive* v. *Mistolin*, 117 D.P.R. 376, 385 (1986).  Under Puerto

---

[9] In its opposition to the motion to dismiss, P.R. Coffee Roasters alleges, for the first time, that Pan American has violated P.R. Coffee Roasters' Puerto Rico trademark rights by means of conduct in Puerto Rico.  In particular, P.R. Coffee Roasters alleges that the "[p]ackaging and marketing" of Rico Coffee "have occurred in Puerto Rico, as [Pan American's] Rico Coffee is produced in Arecibo, Puerto Rico (*see* Docket No. 31-11) and its distribution efforts are done through its office in Guaynabo, Puerto Rico (*see* Docket No. 39-3, No. 39-4, No. 39-5, No 39-6)."  (ECF No 60 at 11-12.)  Based on the citations in that quote, P.R. Coffee Roasters has grounded these allegations on the corporate information that Pan American has placed on packages of Rico Coffee – indicating that the coffee is "[t]oasted and produced by" Pan American, whose place of business is in Arecibo, Puerto Rico – and on numerous invoices from Pan American for mostly rice (and no coffee), which shows a "Remittance Address" in Guaynabo, Puerto Rico.  The allegations thus appear to be speculative.  After all, under federal regulations, the mere fact that a corporation lists an address on its packaging does not mean that the packaged good was actually produced there.  *See* 21 CFR 101.5 ("If a person manufactures, packs, or distributes a food at a place other than his principal place of business, the label may state the principal place of business in lieu of the actual place where such food was manufactured or packed or is to be distributed, unless such statement would be misleading.")  In any event, P.R. Coffee Roasters cannot supplement its amended complaint by means of allegations in its opposition.  *See Schatz*, 669 F.3d at 55-56 (setting forth the universe of facts and allegations that may be consulted when reviewing the sufficiency of pleadings).

1    Rico law, "[t]he right to use a mark is acquired upon [t]he use of the mark in [Puerto

2    Rico] commerce, or the registration [of the mark with the Puerto Rico Department of

3    State] based on the bona fide intention to use the mark in [Puerto Rico] commerce."  10

4    L.P.R.A. § 223a; *see also* § 223(k) (trademark registration is with "Department of State

5    of the Government of Puerto Rico"), 223(r) ("use in commerce" means "use of a mark in

6    trade in Puerto Rico").   Thus, local trademark law seeks to regulate commerce by

7    protecting property interests in specific marks based on the use or intended use of such

8    marks in Puerto Rico.

9         It is clear that a regime that confers intellectual-property rights in Puerto Rico

10   based on commercial conduct in Puerto Rico does not extend its regulatory reach beyond

11   Puerto Rico itself.  It would be strange if the mere registration of a mark with the Puerto

12   Rico Government, based on an intent to use the mark in, say, San Germán, Puerto Rico,

13   thereby conferred on the registrant the right to restrict commercial symbols throughout all

14   of Central Florida, not to mention the entire continental United States.  Perhaps that is

15   why the Government of Puerto Rico Trademark Act expressly limits its definition of "use

16   in commerce" to "use of a mark in trade in Puerto Rico."  10 L.P.R.A. § 223(r).

17        Moreover, the Puerto Rico Supreme Court has held that "[t]he territorial extent of

18   trademark rights is coextensive with [not only] the territorial extent of its *use*," but also

19   "the jurisdiction or market where the court is located, in this case, Puerto Rico."  *Colgate-*

20   *Palmolive*, 117 D.P.R. at 391-92 (citing 2 F. de Solá Cañizares, Tratado de Derecho

21   Comercial Comparado 550-51 (1962)); *see also Posadas de P.R. Assocs. Inc.* v. *Sands*

22   *Hotel & Casino, Inc.*, 131 D.P.R. 21 (1992) (because "trademarks only receive legal

1   protection within a specific market and jurisdiction," the "relevant" scope of Puerto Rico

2   trademark law is "the use of the mark or symbol in Puerto Rico").[10]   Similarly, the First

3   Circuit Court of Appeals has intimated that Puerto Rico trademark law can confer, at

4   most, "a Commonwealth-wide right to use the mark."   *See Dorpan, S.L.* v. *Hotel Melia,*

5   *Inc.*, 728 F.3d 55, 63 (1st Cir. 2013).   Thus, as a matter of statutory construction, the

6   cause of action in 10 L.P.R.A. § 223w does not extend to Pan American's conduct in

7   Florida.

8          In any event, if 10 L.P.R.A. § 223w could be interpreted as regulating trademarks

9   beyond the borders of Puerto Rico, its extraterritorial reach would constitute "a per se

10  violation of the Commerce Clause."   *Pharm. Research & Mfrs. Of Am.* v. *Concannon*,

11  249 F.3d 66, 79 (1st Cir. 2001) (citing *Healy* v. *Beer Inst.*, 491 U.S. 324, 336 [1989]).

12  That is because the application of Puerto Rico trademark law to Florida commerce –

13  restricting how producers may brand their goods in Florida based on how they may brand

14  them in Puerto Rico – "necessarily requires out-of-state commerce to be conducted

15  according to in-state terms."   *Id.* (quoting *Cotto Waxo Co.* v. *Williams*, 46 F.3d 790, 794

16  [8th Cir. 1995]).   And, "[w]hen a state statute regulates commerce wholly outside the

17  state's borders or when the statute has a practical effect of controlling conduct outside of

---

[10] The current status of official English translations of Puerto Rico case law leaves much to be desired.  The most recent bound volume of the Official Translations of the Opinions of the Supreme Court of Puerto Rico was published in 2010.  The volume covers the latter half of 1989, mirroring volume 124 of *Decisiones de Puerto Rico*.  Never mind the opinions of lower courts.  The Puerto Rico case law used in this opinion was found using Westlaw's search engine for the Official Translations.  Unfortunately, Westlaw rarely paginates the Commonwealth opinions in its database.  As a result, our citation of post-1989 opinions often lacks the specific page number of the referenced case law.

1    the state, the statute will be invalid under the dormant Commerce Clause." *Id*. (citing

2    *Cotto Waxo*, 46 F.3d at 793).

3           The unconstitutionality of the extraterritorial application of Puerto Rico trademark

4    law becomes plain when considering "what effect would arise if not one, but many or

5    every, State adopted similar legislation" of extraterritorial reach.  *Id*. (quoting *Healy*, 491

6    U.S. at 336.)  The result would be a one-way ratchet in which the State that confers the

7    most expansive rights upon a trademark holder, thereby restraining the most trade under

8    trademark law, would set the terms of commercial marketing throughout the nation.  For

9    example, under its federal registration of the Café Rico mark, P.R. Coffee Roasters does

10   not hold "the exclusive right to use [the words] 'Café Rico', apart from the mark as

11   shown."  (ECF No. 31-8.)   The Patent & Trademark Office required the disclaimer

12   because "Café Rico" is a descriptive phrase in Spanish, meaning "delicious, rich coffee."

13   (ECF Nos. 31-8; 60 at 9 n.4.)  *Cf. Equine Techs., Inc.* v. *Equitechnology, Inc.*, 68 F.3d

14   542, 545 n.4 (1st Cir. 1995) ("When registering its mark with the Patent & Trademark

15   Office, plaintiff disclaimed any exclusive rights to the term 'EQUINE' because of its

16   descriptive nature"); *but see Bos. Duck Tours*, 531 F.3d at 22 ("it is inappropriate to give

17   the presence or absence of a [trademark] disclaimer any legal significance" because

18   "[t]he power of the Patent & Trademark Office to accept or require disclaimers is

19   discretionary under the statute, and its practice over the years has been far from

20   consistent.").  Meanwhile, under its Puerto Rico registration of the mark, P.R. Coffee

1    Roasters appears to hold a right to the word mark itself.[11]   (*See* ECF No. 31-9.)  This

2    apparent difference in registrability may be due to the decision of the Puerto Rico

3    Supreme Court, back in 1964, that although the word mark "Café Rico" is "descriptive,"

4    it had "acquired secondary meaning in the market of roasted and ground coffee in Puerto

5    Rico."  *Cooperative de Cafeteros de Puerto Rico* v. *F. Colón Colón*, 91 P.R.R. 361, 374,

6    380 (1964).

7            If 10 L.P.R.A. § 223w is given extraterritorial effect, a descriptive term like "Café

8    Rico" that is enforceable in Puerto Rico as a registered trademark could also be enforced

9    in regions where the mark has not acquired secondary meaning, thereby granting P.R.

10   Coffee Roasters an exclusive right to market its coffee in foreign jurisdictions as

11   "delicious" and "rich".  Such a right would violate the long "settled" rule that the law will

12   "not secure to any person the exclusive use of a trade-mark consisting merely of words

13   descriptive of the qualities, ingredients or characteristics of an article of trade" because

14   "[o]ther like goods, equal to them in all respects, may be manufactured or dealt in by

15   others, who, with equal truth, may use, and must be left free to use, the same language of

16   description in placing their goods before the public."  *Estate of P.D. Beckwith, Inc.* v.

17   *Comm'r of Patents*, 252 U.S. 538, 543-44 (1920); *see also KP Permanent Make-Up, Inc.*

18   v. *Lasting Impression I, Inc.*, 543 U.S. 111, 122 (2004) (noting "the undesirability of

19   allowing anyone to obtain a complete monopoly on use of a descriptive term simply by

20   grabbing it first") (citing *Canal Co.* v. *Clark*, 80 U.S. 331, 323-24 (1872)).  Indeed,

---

[11] The Puerto Rico registration for the Café Rico trademark that P.R. Coffee Roasters appended to its amended complaint appears to have expired on December 16, 2012.  (*See* ECF No. 31-9.)  P.R. Coffee Roasters claims that it renewed the Puerto Rico trademark shortly before its December 2012 expiration. (*See* ECF No. 48 at 7.)

1    Congress enacted the Lanham Act in part "to prevent the commercial monopolization of

2    descriptive language" in the public domain.  *Park 'n Fly* v. *Dollar Park & Fly*, 469 U.S.

3    189, 201 (1985) (internal quotations and citation omitted).   The extraterritorial

4    application of Puerto Rico law in this case would not only unravel the delicate balance

5    between free speech and property rights struck in the Lanham Act, but it would also

6    unconstitutionally impede interstate trade and speech.  Accordingly, also as a

7    constitutional matter, the cause of action in 10 L.P.R.A. § 223w does not extend to Pan

8    American's alleged conduct in Florida.

9    **D.     Federal Trademark Misuse Claim**

10          In Count V, P.R. Coffee Roasters asserts that Pan American's alleged "abuse of its

11   trademark registration merits the cancellation of all of its Rico trademarks" under 15

12   U.S.C. § 1115(b)(7).  (ECF No. 31 ¶ 71.)  By attacking a host of registered trademarks

13   unrelated to Pan American's marketing and sale of Rico Coffee in a briefly-argued count

14   near the end of the amended complaint, P.R. Coffee Roasters appears to have pleaded the

15   equivalent of a Hail Mary pass.  *See United States* v. *George*, 676 F.3d 249, 251 (1st Cir.

16   2012) (describing a Hail Mary pass).  Leaving aside whether P.R. Coffee Roasters has

17   standing to attack these trademarks, P.R. Coffee Roasters has not identified a cause of

18   action under which it may bring the claim.  After all, 15 U.S.C. § 1115(b)(7) only

19   supports a defense against an incontestable registered mark on the ground that "the mark

20   has been or is being used to violate the antitrust laws of the United States." *Park 'n Fly*,

21   469 U.S. at 194 n.3.  The statute does not create a cause of action. *Yellowbook Inc.* v.

22   *Brandeberry*, 708 F.3d 837, 847 (6th Cir. 2013) ("[T]rademark misuse is purely an

1    affirmative defense and does not form the basis for an affirmative claim for recovery.")

2    (quoting 6 McCarthy on Trademarks & Unfair Competition § 31:44 [4th ed.]).  As a

3    result, the court dismisses Count V of the amended complaint under Rule 12(b)(6).

4    **E.**     **Puerto Rico Tort Claims**

5          In Count VI, P.R. Coffee Roasters alleges two Puerto Rico tort actions against Pan

6    American.  One action, brought under Article 1802 of the Puerto Rico Civil Code (31

7    L.P.R.A. § 5141), involves Pan American's alleged marketing and sale of Rico Coffee in

8    the State of Florida.  (ECF No. 31 ¶ 73.)  The other action, brought under both Article

9    1802 and the Puerto Rico Libel and Slander Act (32 L.P.R.A. § 3141), involves Pan

10   American's false advertising about P.R. Coffee Roasters and its coffees.  (ECF No. 31

11   ¶¶ 74-76.)   The factual allegations underpinning these actions are duplicative of the

12   allegations  behind  the  trademark-infringement  and  false-advertising  claims  whose

13   pleadings, in Counts I through III, the court found sufficient.  (ECF No. 31 ¶ 72.)  Thus,

14   P.R. Coffee Roasters is using these statutes as a local-law vehicle for its federal claims.

15         32 L.P.R.A. § 3141 simply provides, "The civil action for damages for libel and

16   slander is hereby established."  32 L.P.R.A. § 3142 then defines libel as "the malicious

17   defamation  of  a  person  made  public  by  writing  .  .  .  or  other  mechanical  mode  of

18   publication tending to subject him to public hatred and contempt, . . . or to injure him in

19   his business, or in any other way to throw discredit, contempt or dishonor upon him."  32

20   L.P.R.A. § 3143 defines slander as "a false and unprivileged publication other than libel,

21   which imputes to any person the commission of a crime, or tends directly to injure him in

22   respect to his office, profession, trade or business, or which by natural consequences

1    causes actual damages."  Meanwhile, 31 L.P.R.A. § 5141 is a general tort statute that

2    provides that "[a] person who by an act or omission causes damage to another through

3    fault or negligence shall be obliged to repair the damage so done."

4          P.R. Coffee Roasters asserts that it may vindicate its trademark rights under

5    Article 1802.  (ECF No. 31 ¶ 73.)  At the pleadings stage, P.R. Coffee Roasters's burden

6    "is merely demonstrating the plausibility of [that] claim," and the court finds that P.R.

7    Coffee Roasters has done so.  *See Medina-Velázquez* v. *Hernández-Gregorat*, 767 F.3d

8    103, 112 (1st Cir. 2014).  In particular, the court finds that P.R. Coffee Roasters may

9    pursue a cause of action under Article 1802, contesting Pan American's commercial

10   conduct in the State of Florida, that is wholly duplicative of P.R. Coffee Roasters' valid

11   Lanham Act claims.  After all, Puerto Rico "case law has recognized that the concept of

12   fault in art. 1802 is as broad as the behavior of human beings, and that it includes any

13   fault that causes harm or injury."  *Soc. De Gananciales* v. *El Vocero de P.R.*, 135 D.P.R.

14   122 (1994) (quoting *Colón* v. *Romero Barceló*, 112 D.P.R. 718, 726 (1982)).  And, an act

15   or omission constitutes a fault under Article 1802 if it was "wrongful."  *Id*.  In the

16   amended complaint, only two sources of P.R. Coffee Roasters' trademark rights have

17   been alleged: The Lanham Act, and the Government of Puerto Rico Trademark Act.  (*See*

18   ECF No. 31 ¶ 1.)  In dismissing Count IV, the court has found that P.R. Coffee Roasters

19   cannot use Puerto Rico trademark law to hold Pan American liable for its commercial

20   conduct in Florida.  Thus, at best, P.R. Coffee Roasters' trademark claim under Article

21   1802 can only duplicate the substance of its federal trademark claims.

1    Although the parties have not pointed the court to any case law on the standards of

2    conduct that may be used in Article 1802 suits, state tort claims can be based on

3    violations of federal law.  *See Templeton Bd. Of Sewer Comm'rs* v. *Am. Tissue Mills of*

4    *Mass., Inc.*, 352 F.3d 33, 37-41 (1st Cir. 2003) (discussing cases involving the

5    incorporation of a federal standard into a state-law action).  Given the breadth of conduct

6    that is actionable under Article 1802, the court finds, for present purposes only, that

7    extraterritorial violations of federal trademark law may form the basis of a claim under

8    Article 1802 in a suit between two Puerto Rico citizens.  *But see Reyes-Cardona* v. *J.C.*

9    *Penney Co.*, 694 F.2d 894, 896 (1st Cir. 1982) (Breyer, C.J.) (observing that liability

10   under Article 1802 turns on civil-law, not common-law, principles).

11    The only area in which the Article 1802 claim might differ from the federal

12   trademark claims it otherwise duplicates is in the area of remedies.  "The remedial

13   provisions of the Lanham Act authorize four forms of relief: an accounting of the

14   defendant's profits, any damages sustained by the plaintiff, [and] the costs of the action,

15   [under 15 U.S.C. § 1117[a]), and injunctive relief under §1116(a)."  *Visible Sys. Corp.* v.

16   *Unisys Corp.*, 551 F.3d 65, 78 (1st Cir. 2008).  Meanwhile, Article 1802 is well known as

17   "a general source of law on the basis of which emotional distress damages," for example,

18   "may be claimed."  *SLG Pan Americanan-Renta* v. *Walgreens*, 190 D.P.R. 251 (2014).

19   Whether these extra remedies even apply to the claim alleged is an issue for another day.

20   The court also reserves the issue of whether P.R. Coffee Roasters can use Article 1802 to

21   seek damages unavailable to it under the Lanham Act.  *Id.* (indicating that damages

1    normally available under Article 1802 are prohibited when an "applicable special law"

2    limits relief).

3          Pan American's only challenge to this cause of action is that the Lanham Act has

4    preempted any state tort claim under Article 1802 seeking to vindicate P.R. Coffee

5    Roasters' federal trademark rights.  (ECF No. 39 at 35-36.)  In support of that challenge,

6    Pan American directs the court to a 1952 decision of the Eighth Circuit Court of Appeals

7    in which it held that Iowa trademark law could not "be applied extraterritorily [sic] to

8    interstate commerce and in supersedence [sic] to the Federal Trade-Mark Laws" because

9    "Congress has entered and pre-empted the field of trade-mark law in its application to

10    interstate commerce." *Sargent & Co.* v. *Welco Feed Mfg. Co.*, 195 F.2d 929, 935-36 (8th

11    Cir. 1952).  For the reasons stated in the dismissal of Count IV above, the court agrees

12    that the extraterritorial application of state trademark law would contravene both the

13    dormant Commerce Clause and the Lanham Act.  Here, however, the court faces the

14    unusual situation of a state tort claim that simply duplicates a federal trademark claim.  If

15    it turns out that greater remedies are available under Article 1802 despite the more

16    limited remedies available under the Lanham Act, the court may have to reconsider its

17    decision.  *But see Attrezzi, LLC* v. *Maytag Corp.*, 436 F.3d 32, 42 (1st Cir. 2006)

18    (upholding application of additional remedies under state law to successful trademark

19    claim).  But, in light of the fact that "[t]he Lanham Act does not preempt the states'

20    ability to recognize and protect trademark rights," the court finds that P.R. Coffee

21    Roasters has sufficiently pleaded a duplicative trademark claim under Article 1802.  *See*

22    *Keebler Co.* v. *Rovira Biscuit Corp.*, 624 F.2d 366, 372 n.3 (1st Cir. 1980).

1    P.R. Coffee Roasters' pursuit of its false-advertising claims as a defamation action

2    under both the Puerto Rico Libel and Slander Act and Article 1802 does not fare so well.

3    (ECF No. 31 ¶¶ 74-76; *see also* ECF No. 60 at 22 (asserting "count VI" alleges

4    "defamation under Puerto Rico law").)[12]   Under Puerto Rico law, a "plaintiff in a

5    [defamation] action must show, first of all, that the information published is false and has

6    caused him actual damage." *Villanueva* v. *Hernandez Class*, 128 D.P.R. 618 (1991)

7    (quoting *Torres Silva* v. *El Mundo, Inc.*, 106 D.P.R. 415, 427 [1977]).  "[A] plaintiff is

8    not entitled to receive compensation unless he can prove – in the case of a private person

9    – that the defamatory statements were made in a negligent manner." *Id.* (citing *Oliveras*

10   v. *Paniagua Diez*, 115 D.P.R. 257 [1984]).  "On the other hand, in cases involving public

11   . . . figures, the plaintiff must also show that the information was published with actual

12   malice or with knowledge of its falsity or with reckless disregard of whether it was false

13   or not." *Id.* (citing *Soc. de Gananciales* v. *López*, 116 D.P.R. 112, 115 (1985)).[13]

14   "[T]he question of whether a defamation plaintiff is a public figure is properly

15   resolved by the court, not by the jury, regardless of the contestability of the predicate

---

[12] Pan American argues that P.R. Coffee Roasters' claim here is actually for "dilution by tarnishment" under, among other sources, "section 1125(a) of the Lanham Act." (ECF No. 39 at 36.) Pan American is wrong in two respects. First, the Lanham Act prohibits dilution by tarnishment in 15 U.S.C. § 1125(c). Second, and more importantly, the statute defines "dilution by tarnishment" as an "association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." 15 U.S.C. § 1125(c)(2)(C). Clearly, that does not constitute the substance of P.R. Coffee Roasters' defamation claim.

[13] Puerto Rico law also recognizes the tort of product disparagement or trade libel, a legal theory that appears to more aptly capture the core of P.R. Coffee Roasters' claim. *See Emerito Estrada Rivera-Isuzu De P.R., Inc.*, v. *Consumers Union of U.S., Inc.*, 233 F.3d 24, 30 (1st Cir. 2000).  Unfortunately, "Puerto Rico law on product disparagement is scanty," and P.R. Coffee Roasters expends no effort to explain how product disparagement may involve different elements than defamation. *See id.*; *see also Vascular Solutions, Inc.* v. *Marine Polymer Techs., Inc.*, 590 F.3d 56, 59 (1st Cir. 2009) (per curiam) ("neither the Supreme Court nor this one has decided whether the First Amendment requires in product disparagement actions the actual malice standard of *New York Times Co.* v. *Sullivan*.").  Accordingly, the court will analyze the pleadings under the standard used in Puerto Rico law for defamation claims.

1  facts." *Pendleton* v. *City of Haverhill*, 156 F.3d 57, 68 (1st Cir. 1998).  The "burden of

2  establishing that [a] company is a public figure" rests on the defamation defendant

3  seeking to raise the First Amendment as privileging its alleged conduct.  *Bruno &*

4  *Stillman, Inc.* v. *Globe Newspaper Co.*, 633 F.2d 583, 592 (1st Cir. 1980).  The court

5  finds that Pan American has failed to meet its burden.  The only mention Pan American

6  makes of where the court should place P.R. Coffee Roasters along the public-

7  figure/private-figure spectrum is the bald assertion that "P.R. Coffee Roasters is a public

8  figure in the coffee industry."  (*See* ECF No. 39 at 37.)  Such "'[a] conclusory allegation

9  without evidentiary support' is insufficient to carry [Pan American's] burden of

10 establishing," at the very least, "a *prima facie* case" that P.R. Coffee Roasters is a public

11 figure.  *See Ramos-Echevarrís* v. *Pichis, Inc.*, 659 F.3d 182, 190 (1st Cir. 2011) (citing

12 *Carroll* v. *Xerox Corp.*, 294 F.3d 231, 240 (1st Cir. 2002)).  "This is not to say that under

13 no circumstances could [Pan American] meet that burden" farther down the road.  *Bruno*

14 *& Stillman*, 633 F.2d at 593.  But unless and until that burden has been met, the court will

15 treat P.R. Coffee Roasters as a private figure.

16      The court will "skip over whether [the] complaint plausibly alleges defamation

17 and focus on whether it plausibly alleges [negligence] – given that this is the simplest

18 way to pinpoint [P.R. Coffee Roasters's] problem."  *See Schatz* v. *Republican State*

19 *Leadership Comm.*, 669 F.3d 50, 56 (1st Cir. 2012).  Puerto Rico case law has established

20 a three-prong test, with each prong involving multiple subsidiary considerations, "to

21 determine negligence in libel cases."  *Villanueva*, 128 D.P.R. at n.16 (setting forth the

22 test) (citing *Torres Silva* v. *El Mundo, Inc.*, 106 D.P.R. 415, 425 (1977)).  For example,

1   the Puerto Rico negligence test looks to the "nature of the published information," the

2   "[o]rigin of the information and reliability of its source," and the "[r]easonableness of the

3   process for checking the truthfulness of the information." *Id*.   Granted, to prove

4   negligence under this test, P.R. Coffee Roasters will need the benefit of discovery.   But

5   that does not relieve P.R. Coffee Roasters of the requirement to plead negligence in a

6   non-conclusory manner supported by pertinent facts.  *See Shay* v. *Walters*, 702 F.3d 76,

7   82-83 (1st Cir. 2012).   Yet, the amended complaint does not contain any facts suggesting

8   that Pan American acted negligently in publishing the challenged statements; it offers

9   only conclusory allegations about Pan American's "bad faith" and "full knowledge of

10  [the statements'] falsity."  (*See* ECF No. 31 ¶¶ 33, 76.)   Because these bare conclusions

11  are not "plausible allegations of fault," P.R. Coffee Roasters' defamation claims under

12  Puerto Rico law warrant dismissal as insufficiently pled.  *See Shay*, 702 F.3d at 83.

13       In sum, the only claim in Count VI that survives Pan American's motion to

14  dismiss is a tort claim under Article 1802 that merely duplicates P.R. Coffee Roasters'

15  valid trademark claims under the Lanham Act.   The claim appears plausible on its face,

16  and Pan American has not presented any case law indicating that the claim is improper

17  under Puerto Rico law.

18  **F.     Federal Declaratory Judgment Claim**

19       In Count VII, P.R. Coffee Roasters asks "the Court [to] declare that P.R. Coffee

20  Roasters is the owner of the Café Rico mark and the Rico marks in connection with

21  coffee and coffee-related goods," and that "Pan American and no other person or entity

22  may use the same or confusingly similar trademarks for the sale, distribution, promotion

1    or marketing of coffee and coffee-related products."  (ECF No. 31 ¶ 79.)  The sheer

2    breadth of this request is shocking.

3         P.R. Coffee Roasters does not allege which statute might provide this declaratory

4    relief, and so the court finds that the claim has been brought under the Declaratory

5    Judgment Act.  *See* 28 U.S.C. § 2201.  No other cause of action leaps to mind.  "The

6    Declaratory Judgment Act provides that '[i]n a case of actual controversy within its

7    jurisdiction . . . any court of the United States . . . may declare the rights and other legal

8    relations of any interested party seeking such declaration, whether or not further relief is

9    or could be sought.'"  *MedImmune, Inc.* v. *Genentech, Inc.*, 549 U.S. 118, 126 (2007)

10   (alterations in original) (quoting 28 U.S.C. § 2201(a)).  "[T]he phrase 'case of actual

11   controversy' in the Act refers to the type of 'Cases' and 'Controversies' that are

12   justiciable under Article III."  *Id.* at 127 (citing *Aetna Life Ins. Co.* v. *Haworth*, 300 U.S.

13   227, 240 (1937)).  Due to this all-important constitutional check on judicial power,

14   "[f]ederal courts may not 'decide questions that cannot affect the rights of litigants in the

15   case before them' or give 'opinion[s] advising what the law would be upon a hypothetical

16   state of facts.'"  *Chafin* v. *Chafin*, 133 S. Ct. 1017, 1023 (2013) (quoting *Lewis* v.

17   *Continental Bank Corp.*, 494 U.S. 472, 477 (1990)).  This court may adjudicate a claim

18   under the Act only if "the facts alleged, under all the circumstances, show that there is a

19   substantial controversy, between parties having adverse legal interests, of sufficient

20   immediacy and reality to warrant the issuance of a declaratory judgment."  *Mass.*

21   *Delivery Ass'n* v. *Coakley*, 769 F.3d 11, 16 (2014) (quoting *MedImmune*, 549 U.S. at

22   127).

1        Accordingly, the court cannot issue an advisory opinion about the scope of P.R.

2    Coffee Roasters' trademark rights "in connection with coffee and coffee-related goods,"

3    nor can we opine on the hypothetical liability of an unnamed "other person or entity" that

4    "may use the same or confusingly similar trademarks" at some unknown point in the

5    future.  (*See* ECF No. 31 ¶ 79.)  Thus, all that remains of this count is a request to declare

6    Pan American's liability under the valid trademark claims in the amended complaint.

7    The court dismisses this last aspect of the count as "a duplicative claim."  *See Young* v.

8    *Wells Fargo Bank, N.A.*, 717 F.3d 224, 237 (1st Cir. 2013) (citing *Swartz* v. *KPMG LLP*,

9    476 F.3d 756, 766 (9th Cir. 2007)).

10   **G.**    **<u>Injunctive Relief Claim</u>**

11        In Count VIII, P.R. Coffee Roasters prays for injunctive relief under both the

12   Lanham Act and the Government of Puerto Rico Trademark Act to stop Pan American's

13   alleged infringement of P.R. Coffee Roasters' trademark rights.  The court finds that this

14   count is "merely a remedial measure disguised as a cause of action" and, thus, dismisses

15   it as well.  *See Wilson* v. *HSBC Mortg. Servs.*, 744 F.3d 1, 16 (1st Cir. 2014).  Of course,

16   by striking this count from the amended complaint, the court does not eliminate

17   injunctive relief as a possible remedy if P.R. Coffee Roasters proves victorious.

18                          **IV.**

19         **<u>Length of Party Submissions Under Local Rule 7</u>**

20        Chief Justice Warren E. Burger once noted that, at the appellate level, "[a] brief

21   that raises every colorable issue runs the risk of burying good arguments – those that, in

22   the words of the great advocate John W. Davis, 'go for the jugular' – in a verbal mound

1   made up of strong and weak contentions." *Jones* v. *Barnes*, 463 U.S. 745, 753 (1983)

2   (Burger, C.J.).  "Experienced advocates since time beyond memory have emphasized the

3   importance of winnowing out weaker arguments . . . and focusing . . . at most on a few

4   key issues." *Id.* at 751-52.  As Justice Robert H. Jackson once similarly observed, "Legal

5   contentions, like the currency, depreciate through over-issue."  *Id.* at 752 (quoting

6   Jackson, Advocacy Before the United States Supreme Court, 25 Temple L. Q. 115, 119

7   (1951)).  The same advice holds true before this District Court.

8          Local Rule 7 aids the above winnowing process by mandating the font size,

9   spacing, and page length that parties may use in their written submissions to the court,

10  thereby forcing parties to choose their arguments and words carefully.  Failure to comply

11  with the rule "may entail sanctions."  L.Cv.R. 1(e).  So far in this litigation, the practice

12  of the parties has been to file an oversized brief first and only then to move the court for

13  permission to do so.  (*See* ECF Nos. 40, 52, 67, 80, 87.)  This practice must stop.  This

14  case presents a few straightforward issues of trademark and unfair competition law.

15  Experienced counsel should be able to handle them succinctly.

16         Consider the recent motion practice underlying this order and opinion.  Pan

17  American's motion to dismiss added up to fifty closely-typed pages – double the limit

18  allowed under Local Rule 7(d).  P.R. Coffee Roasters' opposition is comparatively

19  merciful at only twenty-four pages – only sixty percent longer than allowed.  Pan

20  American's reply weighs in at a whopping twenty-two pages, with narrow spacing and

21  abbreviated margins, where the Local Rules provide that "[r]eply memoranda shall not

22  exceed ten (10) pages in length."  L.Cv.R. 7(c).  The court finds no excuse for this verbal

1  elephantitis, whose main symptoms are the excessive recital of basic law and the pursuit of

2  general arguments premised on unchecked assumptions.  Despite the extra length, the parties

3  often fail to cogently or even adequately present their arguments, thereby passing on to the court

4  the onus of clearing a path through their thick and disjointed presentations.  "We believe it

5  appropriate to discourage the filing of excessively long briefs in this court."  *Doyle* v. *Hasbro,*

6  *Inc.*, 103 F.3d 186, 196 (1st Cir. 1996) (quoting *In re M.S.V., Inc.*, 892 F.2d 5, 6 (1st Cir. 1989)).

7  Accordingly, the court hereby orders the parties to keep all future briefing within the bounds

8  prescribed by Local Rule 7.

9                                               **V.**

10                                        **Conclusion**

11       The court hereby **GRANTS IN PART** and **DENIES IN PART** the motion to dismiss the

12  amended complaint under Rule 12(b)(6) for failure to state claims upon which relief can be

13  granted.  (ECF No. 38.)  Specifically, the court dismisses Counts IV, V, VII, and VIII in their

14  entirety.  The court dismisses most of Count VI, leaving in place, for the time being, only an

15  Article 1802 claim that duplicates P.R. Coffee Roasters' valid federal trademark claims.

16  Meanwhile, Counts I, II, and III appear to state plausible claims on their face and do not warrant

17  dismissal under the arguments in the motion.  Although Pan American presented numerous

18  matters outside the pleadings in the motion, the court has excluded those matters from

19  consideration and thus has declined to treat the motion as one for summary judgment under Rule

20  56.  *See* Fed. R. Civ. P. 12(d).

21       **IT IS SO ORDERED.**

22       San Juan, Puerto Rico, this 11th day of December, 2015.

23                                          S/José Antonio Fusté
24                                          JOSE ANTONIO FUSTE
25                                          U. S. DISTRICT JUDGE